UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) INDICTMENT NO. |
| | ) |
| v. | ) 18 U.S.C. § 371 |
| | ) Conspiracy |
| PATRICK C. MOORE, JR. | ) |
| | ) 42 U.S.C. § 1320a7b(b)(1) and (2) |
| | ) Anti-Kickback Statute |
| | ) |

CR122-0014

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise indicated:

## INTRODUCTION

1. Patrick C. Moore, Jr. ("**MOORE**") and his co-conspirators unlawfully submitted and caused to be submitted false and fraudulent claims to Federal health care programs, including Medicare, for prescriptions for genetic tests. Medicare paid approximately $11.5 million on these false and fraudulent claims. These prescriptions, as the defendants knew and intended, were, among other things, medically unnecessary, not provided as represented, not eligible for reimbursement, and induced through the payment and receipt of unlawful kickbacks and bribes, in violation of the Federal Anti-Kickback Statute. **MOORE** and his co-conspirators distributed payments from Federal health care programs among themselves to unlawfully enrich and benefit themselves and others.

The Medicare Program (Generally)

2. The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were the age of 65 or older, or disabled. The

benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

3. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

4. Medicare covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, as well as office services and outpatient care—including the ordering of diagnostic testing—that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

5. Physicians, clinics, laboratories, and other health care providers that rendered services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

6. To receive Medicare reimbursement, providers had to apply and execute a written provider agreement, known as CMS Form 855. The Medicare application was required to be signed by an authorized representative of the provider. The application contained certifications that the provider agreed to abide

by the Medicare laws and regulations, including the Federal Anti-Kickback Statute, and that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

7.  Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, documented, and actually provided as represented to Medicare. Medicare would not pay for items or services that were procured through kickbacks and bribes.

### Genetic Testing

8.  Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. Pharmacogenetic ("PGx") testing used DNA sequencing to assess how the body's genetic makeup would affect the response to certain medications. Genetic tests that could predict future risks of cardiac conditions and diseases such as Parkinson's and Alzheimer's were also available. All such tests were generally referred to as "genetic testing." Genetic testing was not a method of diagnosing whether an individual had a disease, such as cancer, at the time of the test.

9.  To conduct genetic testing, a laboratory needed to obtain a DNA sample ("specimen") from the beneficiary. Specimens were typically obtained from the beneficiary's saliva by using a cheek swab to collect sufficient cells to provide a

3

genetic profile. The specimen was then submitted to the laboratory to conduct a genetic test.

10. Specimens were submitted along with laboratory requisition forms that identified the beneficiary, the beneficiary's insurance information, and the specific test to be performed. In order for laboratories to submit claims to Medicare for genetic testing, the tests had to be approved by a physician or other authorized medical professional who attested to the medical necessity of the test.

11. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

12. If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided that "all diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." It also provided that "[t]ests not ordered by the physician who is treating the beneficiary

4

are not reasonable and necessary." *Id.*

### The Defendant and Related Individuals and Entities

13. Center Street Marketing, LLC ("Center Street") was a Georgia-based limited liability company owned and operated by defendant **MOORE** and Michael Speer. Center Street's principal office address was in the Augusta Division of the Southern District of Georgia. Center Street purportedly provided marketing services and recruited Medicare beneficiaries for CGx testing and pharmacogenomic ("PGx") testing.

14. Semiotic Concepts Limited Company ("Semiotic Concepts") was a Georgia-based limited liability company owned and operated by defendant **MOORE** and Michael Speer. Semiotic Concept's principal office address was in the Augusta Division of the Southern District of Georgia. Semiotic Concepts maintained an account at Wells Fargo Bank ending in x5046 ("Semiotic Concepts Account").

15. **MOORE**, a resident of Peachtree City, Georgia, was a part-owner and operator of Center Street and Semiotic Concepts.

16. Michael Speer, a resident of Savannah, Georgia, was a part-owner and operator of Center Street and Semiotic Concepts. **MOORE** and Speer conducted their CGx and PGx marketing business using the business names Center Street and Semiotic Concepts interchangeably.

17. Company-1 was a limited liability company operating out of New Jersey and Florida that purported to market genetic tests to Medicare beneficiaries. Company-1 was owned and operated by Clifford Powell and Christian Arendt.

Company-1 maintained an account at Wells Fargo Bank ending in x4188 ("Company-1 Account"), among others. Center Street was one of many marketing sub-groups that operated in a hierarchal payment structure, with Company-1 at the top.

18. Medicare beneficiaries J.L., W.D.F., and A.D. all resided in the Southern District of Georgia.

## COUNT ONE
*Conspiracy to Defraud the United States and to Solicit or Receive Illegal Remuneration*
(Violation of 18 U.S.C. § 371)

19. All previous paragraphs of this Indictment are realleged and incorporated herein by reference.

20. From in or around August 2018, and continuing through in or around September 2019, the exact dates being unknown to the Grand Jury, in the Southern District of Georgia and elsewhere, the defendant,

**PATRICK C. MOORE, JR.**,

Michael Speer, Clifford Powell, Christian Arendt, and others, known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other to commit the following offenses against the United States, that is:

a. to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare;

b.  to violate Title 42, United States Code, Section 1320a-7b(b)(1), by soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

c.  to violate Title 42, United States Code, Section 1320a-7b(b)(2), by offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### Object/Purpose of the Conspiracy

21.  It was an object/purpose of the conspiracy for **MOORE** and others to unlawfully rich themselves by, among other things, (a) offering, paying, soliciting, and receiving kickbacks and bribes in exchange for beneficiary insurance information

and specimens that laboratories used to submit false and fraudulent claims to Medicare; (b) concealing the payment and receipt of kickbacks and bribes and the receipt and transfer of proceeds from the fraud; and (c) diverting proceeds of the fraud for their personal use and benefit, for the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

22. The manner and means by which **MOORE** and his co-conspirators sought to accomplish the object and purpose of the conspiracy, included, among other things, the following:

a. Through their companies, Center Street and Semiotic Concepts, **MOORE** and Speer oversaw a network of recruiters and marketers, who they instructed to target Medicare beneficiaries in the Southern District of Georgia and elsewhere, and to induce those beneficiaries to accept genetic tests that were medically unnecessary and not eligible for reimbursement.

b. **MOORE** and his co-conspirators gained access to Medicare beneficiaries' insurance information and specimens through various means of solicitation, including approaching beneficiaries at their homes, telemarketing campaigns, and appearing at storefronts and health fairs.

c. At the direction of **MOORE** and Michael Speer, Center Street and Semiotic Concepts recruiters and marketers collected specimens and personal identifying information from Medicare beneficiaries, in the Southern District of Georgia and elsewhere, which were used to generate completed orders or requisitions

for genetic tests and other Medicare-required documents (collectively referred to as "doctors' orders") that were, in turn, used to support false and fraudulent claims to Medicare for those tests.

  d. The doctors' orders for genetic tests were signed by physicians and other licensed medical professionals who had not seen, spoken to, or otherwise treated the Medicare beneficiaries, and in the absence of any physician-patient relationship. The physicians and other licensed medical professionals were not treating the beneficiaries for whom they signed orders for genetic tests for cancer or symptoms of cancer, and they did not use the test results in the treatment of those beneficiaries.

  e. In order to increase revenue for themselves and their co-conspirators, **MOORE**, Michael Speer, Clifford Powell, Christian Arendt, and others paid or caused payments to be made to physicians and other licensed medical professionals to induce them to sign doctors' orders for genetic testing.

  f. At the direction of **MOORE** and Michael Speer, the specimens and signed doctors' orders collected by Center Street and Semiotic Concepts recruiters and marketers were provided to Company-1, which in turn provided the specimens and doctors' orders to laboratories that billed Medicare for genetic tests that were medically unnecessary, not provided as represented, and not eligible for reimbursement.

  g. **MOORE**, Michael Speer, Clifford Powell, Christian Arendt, and their co-conspirators received kickbacks and bribes in exchange for the referral of

beneficiary insurance information, specimens, and the accompanying doctors' orders for the genetic testing.

h.   **MOORE** and Michael Speer paid Company-1 a "telemedicine" or "teledoc" fee—approximately $100—for each beneficiary's test authorized by a physician or other medical professional. This fee was to cover the cost of obtaining a physician's signature on the doctors' order for genetic tests.

i.   In exchange for providing laboratories with the specimens and doctors' orders for each beneficiary, Clifford Powell and Christian Arendt received kickbacks and bribes from those laboratories and associated entities through electronic deposits into Company-1's bank accounts, including the Company-1 Account. Clifford Powell and Christian Arendt then in turn paid kickbacks and bribes to Company-1's marketers and recruiters out of those bank accounts, including into the Semiotic Concepts Account, for the benefit of **MOORE**, Michael Speer, and others. **MOORE** and Michael Speer then in turn paid kickbacks and bribes to Center Street and Semiotic Concept's marketers and recruiters out of Center Street and Semiotic Concepts' bank accounts, including the Semiotic Concepts Account.

j.   To conceal the kickbacks and bribes, **MOORE**, Michael Speer, and their co-conspirators created, and forwarded to Company-1, sham invoices documenting a fabricated number of hours worked instead of what payment was actually for: beneficiary insurance information and genetic specimens that laboratories used to submit false and fraudulent claims to Medicare.

k.   From in or around August 2018, and continuing through in or around November 2019, **MOORE** and Michael Speer, through the Semiotic Concepts Account and others, received kickbacks and bribes in the amount of approximately $5.9 million from Company-1 in exchange for beneficiary information, specimens, and doctors' orders that laboratories used to submit false and fraudulent claims to Medicare.

l.   From in or around August 2018, and continuing through in or around November 2019, laboratories associated with Company-1 and Center Street/Semiotic Concepts submitted and caused the submission of claims to Medicare and were paid approximately $11.5 million for genetic tests, which were the product of kickbacks and bribes paid to **MOORE** and others.

### Overt Acts

23.   In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Augusta Division of the Southern District of Georgia, and elsewhere, the following overt acts:

24.   On or about March 14, 2019, Christian Arendt sent an email to Company-1's recruiters and marketers, including Michael Speer, among others, with Clifford Powell copied, subject "Please Review," and attached "a sample invoice," showing how to falsely document purported hours worked.

25.   In or around March or April 2019, Clifford Powell explained on a teleconference with Company-1's recruiters and marketers, including **MOORE**, Michael Speer, and others, "You guys are going to continue working, continue putting

up great volume. We are going to continue paying you guys, just as strong or better as we always have. But the big things we cannot do, we cannot send reporting very specific where it talks about volume through email, because we're just leaving this big paper trail, if you would. When you have a question on a commission that is being paid out or payment per hour that are being worked, we cannot ask those questions. 'Hey, I did 333 samples, I have sent this invoice and you are telling me that this is wrong.' We can't do that through email. [. . .] And so any kind of paper trail created that points to volume is a bad, bad thing."

26.  On or about April 11, 2019, MOORE sent an email to Clifford Powell and Christian Arendt, with Michael Speer copied, subject "CSM Invoice 3/16-3/31/2019," and stated, "Christian, Please find the attached invoice as discussed. If possible, could we submit a secondary invoice? Thank you, Patrick." Attached to the email was an invoice from MOORE at Semiotic Concepts to Christian Arendt at Company-1, requesting $206,650.00 for a list of items described as, for example, "CGX COMP," and "PGX."

27.  Later that same day, on or about April 11, 2019, MOORE sent another email to Clifford Powell and Christian Arendt, with Michael Speer copied, subject "CSM Adjusted Invoice (3/16-3/31/2019)," and stated, "Christian, Per our discussion, please find the adjusted invoice attached. Thank you, Patrick." Attached to the email was an invoice from MOORE at Semiotic Concepts to Christian Arendt at Company-1, requesting $206,650.00 for a revised list of items all described as "REFERRAL SERVICES."

28. On or about March 27, 2019, **MOORE** and Michael Speer oversaw the collection of specimens and personal identifying information from Medicare beneficiary D.W.F., in the Southern District of Georgia.

29. On or about June 10, 2019, **MOORE** and Michael Speer referred D.W.F.'s specimens and attendant doctors' orders to Company-1. On or about the same day, **MOORE** sent Christian Arendt a sham invoice for "referral services" to conceal the nature of the payment.

30. For D.W.F's referral, on or about June 10, 2019, Clifford Powell and Christian Arendt, through Company-1, paid a kickback from the Company-1 Account to **MOORE** and Michael Speer at the Semiotic Concepts Account, in the approximate amount of $300.

31. On or about April 9, 2019, **MOORE** and Michael Speer oversaw the collection of specimens and personal identifying information from Medicare beneficiary J.L., in the Southern District of Georgia.

32. On or about May 10, 2019, **MOORE** and Michael Speer referred J.L.'s specimens and attendant doctors' orders to Company-1. On or about the same day, **MOORE** sent Christian Arendt a sham invoice for "referral services" to conceal the nature of the payment.

33. For J.L.'s referral, on or about May 10, 2019, Clifford Powell and Christian Arendt, through Company-1, paid a kickback from the Company-1 Account to **MOORE** and Michael Speer at the Semiotic Concepts Account, in the approximate amount of $1,400.

34.   On or about May 28, 2019, **MOORE** and Michael Speer oversaw the collection of specimens and personal identifying information from Medicare beneficiary A.D., in the Southern District of Georgia.

35.   On or about June 24, 2019, **MOORE** and Michael Speer referred A.D.'s specimens and attendant doctors' orders to Company-1. On or about the same day, **MOORE** sent Christian Arendt a sham invoice for "referral services" to conceal the nature of the payment.

36.   For A.D.'s referral, on or about June 25, 2019, Clifford Powell and Christian Arendt, through Company-1, paid a kickback from the Company-1 Account to **MOORE** and Michael Speer at the Semiotic Concepts Account, in the approximate amount of $850.

All done in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FOUR
*Payment and Receipt of Kickbacks*
(42 U.S.C. §§ 1320a7b(b)(1) and (2) and 18 U.S.C. § 2)

37. Paragraphs 1 through 18 and 21 through 36 of this Indictment are realleged and incorporated as though fully set forth herein.

38. On or about the dates listed below, in the Augusta Division of the Southern District of Georgia, and elsewhere,

**PATRICK C. MOORE, JR.,**

aiding and abetting and aided and abetted by Michael Speer, Clifford Powell, Christian Arendt, and others known and unknown to the Grand Jury, did knowingly and willfully solicit and receive remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by direct deposit, wire transfer, and check, for referring an individual for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, that is, Medicare; and for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare:

| Count | Medicare Beneficiary | Approximate Date of Payment | Approximate Amount of Kickback Payment and Details |
|---|---|---|---|
| 2 | J.L. | 5/10/2019 | $1,400 payment from Company-1 Account to Semiotic Concepts Account, for the benefit of MOORE, Michael Speer, and others |

15

| Count | Medicare Beneficiary | Approximate Date of Payment | Approximate Amount of Kickback Payment and Details |
|---|---|---|---|
| 3 | W.D.F. | 6/10/2019 | $300 payment from Company-1 Account to Semiotic Concepts Account, for the benefit of **MOORE, Michael Speer**, and others |
| 4 | A.D. | 6/25/2019 | $850 payment from Company-1 Account to Semiotic Concepts Account, for the benefit of **MOORE, Michael Speer**, and others |

Each in violation of Title 42, United States Code, Sections 1320a-7b(b)(1) and (2), and Title 18, United States Code, Section 2.

## **FORFEITURE ALLEGATIONS**
(18 U.S.C. § 982(a)(7))

39.     Pursuant to 18 U.S.C. § 982(a)(7), upon conviction of Counts One through Four, **MOORE** shall forfeit to the United States, any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

40.     Pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), if any of the property described above, as a result of any act or omission of a defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred, sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

A True Bill.

JOSEPH S. BEEMSTERBOER
Acting Chief
U.S. Department of Justice
Criminal Division, Fraud Section

BRYNN A. SCHIESS
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
Phone: (202) 374-3484
Brynn.Schiess@usdoj.gov
*Lead Counsel

DAVID H. ESTES
United States Attorney
Southern District of Georgia

KARL I. KNOCHE
Assistant United States Attorney
Chief, Criminal Division

JONATHAN A. PORTER
Assistant United States Attorney
Southern District of Georgia
*Co-lead Counsel

16